**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| HARLEY KLEIN,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>        Defendant. | CASE NO. 1:24-CV-00732<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Harley Klein ("Plaintiff" or "Mr. Klein") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1]  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 5.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

On July 25, 2022, Mr. Klein filed applications for DIB and SSI, alleging a disability onset date of September 5, 2012, in his SSI application (Tr. 130) and a disability onset date of

---

[1] The ALJ used the pronouns "they" and "their" when referring to Plaintiff in his decision.  (Tr. 17-26.)  However, in Plaintiff's Brief on the Merits, counsel uses the pronouns "he" and "his" when referring to Plaintiff.  (ECF Doc. 8.)  Accordingly, the Court refers to Plaintiff as "Mr. Klein" and uses pronouns "he" and "his" when referring to Plaintiff in this Memorandum Opinion and Order.

1

June 22, 2022, in his DIB application (Tr. 165).[2]  (Tr. 15, 130-36, 165-67.)  He alleged disability

due to autism and depression.  (Tr. 231.)  Mr. Klein's applications were denied at the initial level

(Tr. 15, 82-86) and upon reconsideration (Tr. 15, 93-95),[3] and he requested a hearing (Tr. 15,

97).  On September 29, 2023, a telephonic hearing was held before an Administrative Law Judge

("ALJ").  (Tr. 32-62.)

On October 17, 2023, the ALJ issued a decision, finding Mr. Klein had not been under a

disability within the meaning of the Social Security Act from June 22, 2022, through the date of

the decision.  (Tr. 12-31.)  Mr. Klein sought review of the decision by the Appeals Council.  (Tr.

127-28.)  On March 7, 2024, the Appeals Council found no reason to review the decision,

making the October 17, 2023 decision the final decision of the Commissioner.  (Tr. 1-6.)

On April 23, 2024, Mr. Klein filed a Complaint challenging the Commissioner's final

decision denying his applications for social security disability benefits.  (ECF Doc. 1.)  The

matter is fully briefed.  (ECF Docs. 8 & 10.)

## II.    Evidence

### A.    Personal and Educational Evidence

Mr. Klein was born in 2002 (Tr. 24, 130) and was living with his grandmother at the time

of the hearing (Tr. 40).  He graduated from high school.  (Tr. 41, 231-32.)  His August 2022

Disability Report indicates that he did not receive special education services (Tr. 232), but the

record reflects that he did receive special education services in sixth grade (Tr. 172-226).

---

[2] Mr. Klein previously received social security disability benefits as a child in connection with a 2014 application based on a finding that he medically equaled Listing 112.10AB.  (Tr. 38, 65.)

[3] Mr. Klein's application for DIB was initially denied due to lack of insured status.  (Tr. 301.)  This determination was reversed, and his DIB claim was reopened and heard and decided after the Social Security Administration determined that it had missed earnings that established a date first insured of April 1, 2022, and a date last insured of December 31, 2023.  (Tr. 15-16, 301.)

**B.      Vocational Evidence**

Mr. Klein received vocational services through Opportunities for Ohioans with

Disabilities, Bureau of Vocational Rehabilitation ("OOD").  (Tr. 449.)  On August 30, 2023,

Susan Kuder, CRC, provided a letter indicating Mr. Klein's OOD case was closed on February 9,

2023, after he obtained a part-time job with Auntie Anne's Pretzels ("Auntie Anne's").  (*Id.*)

She stated that Mr. Klein had required vocational rehabilitation services, including assistance

with interviewing, looking for and applying for jobs, and on-site job coaching, to assist him with

obtaining and retaining the job.  (*Id.*)

At the time of the September 2023 ALJ hearing, Mr. Klein testified that he was still

working part-time at Auntie Anne's.  (Tr. 41, 50-51, 297.)  He typically worked two four-hour

shifts every week.  (*Id.*)  He had previously attempted to work full-time as a machine operator in

2021, and was employed in that capacity for about three months.  (Tr. 41-42.)

**C.      Medical Evidence**

**1.      Treatment History**

On January 14, 2020, Mr. Klein presented to Neil Bruce, M.D., at University Hospitals

for a medication follow-up visit for his mental health conditions.  (Tr. 332-34.)  He was in his

senior year of high school.[4]  (*Id.*)  He reported that his mood had been good, and he was "mostly

happy with some anxiety related to midterms."  (*Id.*)  His sleep was good, and his appetite was

normal.  (*Id.*)  For fun, he reported playing videogames and playing with friends.  (*Id.*)  Mr.

Klein was planning on attending trade school following graduation.  (*Id.*)  On mental status

examination, Mr. Klein's demeanor was described as "average" and "somewhat socially

---

[4] During an office visit with Dr. Bruce on August 28, 2019, Mr. Klein had reported difficulty making friends when he was younger and being bullied when he was in fifth grade, but he also said he was looking forward to starting his senior year, he had a lot of friends at school, and he knew his teachers well.  (Tr. 323.)  He was taking Adderall XR and Prozac.  (Tr. 325.)  With medication, he was concentrating well and had no anxiety or depressive symptoms, and there were no reported medication side effects.  (*Id.*)

awkward." (Tr. 333.)  His eye contact was intermittent, but his motor activity was normal and he was alert, oriented x3, well-groomed, and cooperative. (*Id.*)  His speech was clear, but he spoke in short sentences. (*Id.*)  He was euthymic with a full affect. (*Id.*)  His thought processes were goal-directed with normal thought association. (*Id.*)  His language, fund of knowledge, and memory were appropriate for his age. (Tr. 333-34.)  His attention and concentration were normal. (Tr. 334.)  His cognition was intact, and his insight and judgment were good. (*Id.*)  He was diagnosed with attention deficit hyperactivity disorder (ADHD), anxiety and depression, and autism spectrum disorder. (*Id.*)  Dr. Bruce noted that Mr. Klein was "currently doing well, concentrating well with no anxiety or depressive symptoms and no side effects of medication reported." (*Id.*)  He refilled Mr. Klein's prescriptions for Adderall XR and Prozac. (*Id.*)

On March 31, 2021, Mr. Klein presented to Adetokunbo Esho, M.D., at the Cleveland Clinic for prescription refills. (Tr. 386-87.)  He was eighteen years old. (Tr. 387.)  His grandmother attended the visit with him. (*Id.*)  He reported taking Adderall for his ADHD for years and said he was doing well on the medication. (*Id.*)  He said it worked "especially well for him at his job," noting he worked second shift and did not take his medication until right before he had to go in for work. (*Id.*)  Mr. Klein and his grandmother asked about a prescription for a smaller dose so he could take an extra pill in the morning to "help him in certain situations" such as that morning "when he did not feel comfortable driving to [his] appointment." (*Id.*)  He reported getting migraines if his extended-release Adderall was increased above his 25 mg daily dose. (*Id.*)  On mental status examination, Mr. Klein's mood and behavior were normal. (Tr. 388.)  He was diagnosed with ADHD, predominately inattentive type. (*Id.*)  Dr. Esho prescribed Adderall XR 25 mg and Adderall 5 mg. (*Id.*)

On August 2, 2021, Mr. Klein presented to Timothy Miller, M.D., at the Cleveland Clinic for follow up regarding his attention deficit disorder and pervasive developmental delay.  (Tr. 349-50.)  He was doing well with his ADHD, anxiety, and depression on his medication regimen.  (Tr. 349.)  He was living with his grandmother and father.  (Tr. 350.)  He reported being able to drive and was working a regular job with a CNC machine.  (*Id.*)  He denied significant side effects but reported getting intermittent headaches with mild nausea over the last several years.  (*Id.*)  He said he had these types of headaches over the past two weeks, but they resolved with over-the-counter ibuprofen.  (*Id.*)  He was alert and oriented on examination with no abnormal mental status findings noted.  (Tr. 351.)  Dr. Miller continued Mr. Klein's Adderall for ADHD, predominately inattentive type, and Prozac for anxiety and depression.  (Tr. 349.)  Mr. Klein received medication refills in 2021 and 2022.  (Tr. 343, 376-81.)

On August 27, 2022, Mr. Klein returned to Dr. Miller for an annual physical examination.  (Tr. 370-76.)  He reported having difficulty maintaining jobs.  (Tr. 373.)  He would "do okay initially however when the routine . . . changed he [had] a hard time adjusting."  (*Id.*)  On examination, his affect was flat but not inappropriate.  (*Id.*)  His speech was delayed, and his eye contact was poor, but he answered direct questions.  (*Id.*)  His diagnoses included pervasive developmental disorder, autism spectrum disorder, recurrent major depressive disorder in full remission, and anxiety.  (Tr. 371.)  He continued to take Adderall and Prozac.  (Tr. 372.)

On September 14, 2022, Mr. Klein presented to Michael Anikeev, M.D., at Charak Center for Health and Wellness ("Charak") via videoconferencing for evaluation.  (Tr. 361-65.)  His presenting problems were attention deficit, anxiety, and occasional sad mood.  (Tr. 361.)  He reported being "fairly stable on current medications" of Adderall and Prozac as prescribed by his primary care physician Dr. Miller.  (*Id.*)  He reported that his symptoms reemerged if he went

without medication for three to four days.  (*Id*.)  On examination, Mr. Klein was well-groomed with average eye contact and normal motor activity.  (Tr. 363.)  His demeanor was cooperative but guarded.  (*Id*.)  His speech was clear and normal.  (*Id*.)  His mood was anxious with a constricted affect.  (*Id*.)  His thought processes were logical.  (*Id*.)  His immediate memory and attention/concentration were impaired.  (*Id*.)  His reasoning was intact, and his insight and judgment were fair.  (Tr. 363-64.)  His impulse control was normal.  (Tr. 364.)  Dr. Anikeev categorized Mr. Klein's "Clinical Global Impression – Severity" as "5" which correlated to "markedly ill."  (*Id*.)  Mr. Klein was diagnosed with ADHD, predominately inattentive type, and Asperger's Syndrome.  (*Id*.)

On January 2, 2023, Mr. Klein returned to Dr. Anikeev for a videoconference visit.  (Tr. 405-06.)  He reported he was "doing ok," and he was "fairly stable," with no side effects.  (Tr. 405.)  Mr. Klein returned to Dr. Anikeev the following week on January 9, 2023, for a videoconference visit.  (Tr. 403-04.)  He reported having low energy and problems focusing and completing tasks at work.  (Tr. 403.)  Dr. Anikeev offered Mr. Klein a trial of Strattera to see if a new medication would address his symptoms.  (Tr. 403, 404.)  Plaintiff indicated he would decide about the new medication after talking with his primary care physician.  (*Id*.)  Mr. Klein returned again for a videoconference visit with Dr. Anikeev on January 23, 2023.  (Tr. 401-02.)  He reported he was "doing ok."  (Tr. 401.)  He reported occasional anxiety caused by legitimate factors but denied symptoms of depression and suicidal/homicidal ideations and plans.  (*Id*.)

On May 17, 2023, Mr. Klein returned to Dr. Miller for follow up regarding his attention deficit and pervasive developmental disorder.  (Tr. 443.)  He reported that he continued to have difficulty holding down jobs.  (*Id*.)  He said he would start out okay and then after a period of time he would have a hard time staying on task and completing things.  (*Id*.)  He was working

and said he used his medications daily. (*Id*.) He reported that his depression symptoms were under fair control. (*Id*.) On examination, he was alert and oriented to person, place, and time. (Tr. 445.) He continued to take Adderall and Prozac. (Tr. 444.)

### 2. Opinion Evidence

#### i. Treating Source

On February 22, 2023, Dr. Anikeev completed a Medical Source Statement – Mental Capacity.[5] (Tr. 431-33.) Dr. Anikeev stated Mr. Klein had been under his care since September 14, 2022. (Tr. 432.) In the check-box form, Dr. Anikeev rated Mr. Klein's functional abilities in the areas of: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.[6] (Tr. 431-32.)

In the functional category of understanding, remembering, or applying information, Dr. Anikeev opined that Mr. Klein had: *moderate* limitations in recognizing a mistake and correcting it, identifying and solving problems, using reason and judgment to make work-related decisions, and understanding and learning terms, instructions or procedures; and *marked* limitations in following one or two step oral instructions to carry out a task, describing work activity for someone else, asking and answering questions and providing explanations, and sequencing multi-step activities. (Tr. 431.)

In the functional category of interacting with others, Dr. Anikeev opined that Mr. Klein had: *mild* limitations in responding to requests, suggestions, criticism, correction, and challenges; *moderate* limitations in stating his own point of view and understanding and responding to social cues (physical, verbal, emotional); *marked* limitations in cooperating with others, asking for help

---

[5] The Statement was also signed by Laura Negri, RMA. (Tr. 432, 433.)

[6] The available rating choices were no limitation (or none), mild limitation, moderate limitation, marked limitation, and extreme limitation. (Tr. 431-32.)

when needed, initiating or sustaining conversation, and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; and *extreme* limitations in handling conflicts with others.  (*Id.*)

In the functional category of concentrating, persisting, or maintaining pace, Dr. Anikeev opined that Mr. Klein had: *moderate* limitations in initiating and performing tasks that he understands and knows how to do, changing activities or work settings without being disruptive, sustaining an ordinary routine and regular attendance at work, and working a full day without needing more than the allotted number or length of rest periods during the day; *marked* limitations in working at an appropriate and consistent pace, completing tasks in a timely manner, and working close to or with others without interrupting or distracting them; and *extreme* limitations in ignoring or avoiding distractions while working.  (Tr. 432.)

In the functional category of adapting or managing oneself, Dr. Anikeev opined that Mr. Klein had: *mild* limitations in distinguishing between acceptable and unacceptable work performance; *moderate* limitations in responding to demands, setting realistic goals, making plans for oneself independent of others, maintaining personal hygiene and attire appropriate to a work setting, and being aware of normal hazards and taking appropriate precautions; *marked* limitations in managing his psychologically based symptoms; and *extreme* limitations in adapting to changes.  (*Id.*)

Following the check-box ratings, the form instructed: "It is imperative that you provide an explanation of the medical and clinical findings that support your assessment of limitations - a simple recitation of the diagnosis will not be sufficient to comply with Social Security's regulations."  (*Id.*)  Then the form requested that Dr. Anikeev "[s]tate the diagnosis and medical and clinical findings that support[ed] [his] assessment."  (*Id.*)  In response, Dr. Anikeev stated:

8

"[Mr. Klein] diagnosed through medical and disability assessment (F90.0) Attention-deficit Hyperactivity disorder, predominantly inattentive (F84.5) Asperger's Syndrom[e]." (*Id*.)

### ii.    One-Time Examining Psychologist

On September 5, 2012, when Mr. Klein was 10 years old, he presented for an evaluation by Michelle Matzke, Psy.D., at the request of his then psychologist Wendy Cunningham, Psy.D., to determine whether he met the diagnostic criteria for a disorder on the autism spectrum. (Tr. 305-18.) Dr. Matzke found that Mr. Klein exhibited symptoms typically associated with Asperger's Disorder, but concluded based on abnormalities in his production of speech (i.e., speech regression) that a diagnosis of Pervasive Developmental Disorder, Not Otherwise Specified more accurately explained his clinical presentation. (Tr. 314.) Dr. Matzke also diagnosed Anxiety Disorder, Not Otherwise Specified.[7] (*Id*.) Dr. Matzke provided recommendations for Mr. Klein, his family, and his school to follow and consider implementing to help Mr. Klein manage his symptoms. (Tr. 314-18.) Her recommendations included learning more about Mr. Klein's diagnoses, implementing a structured routine at home, starting a reward system at home to reinforce desirable and developing behaviors, increasing opportunities for socialization, talking to the school about an Individual Education Program (IEP), and attending individual, family, and group therapy. (*Id*.)

### iii.    State Agency Psychological Consultants

On November 1, 2022, state agency psychological consultant Karla Delcour, Ph.D., completed a Psychiatric Review Technique ("PRT") and a mental RFC assessment. (Tr. 67-70.) In the PRT, Dr. Delcour opined that Mr. Klein had moderate limitations in his ability to:

---

[7] Dr. Matzke noted that Dr. Cunningham had diagnosed Mr. Klein with ADHD, Predominately Inattentive Type, and Developmental Coordination Disorder following an evaluation in the spring of 2012, but found that the symptoms associated with those diagnoses were accounted for by the diagnosis of Pervasive Development Disorder, Not Otherwise Specified. (Tr. 306-07, 314.)

understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 67.)  In the mental RFC assessment, Dr. Delcour opined Mr. Klein had the ability to: complete simple and routine tasks in a predictable work environment where pace is not fast and there are no strict time or production quotas; interact with coworkers, supervisors, and the general public occasionally and superficially; and work in an environment where major changes are infrequent.  (Tr. 68-70.)  As additional explanation for the mental RFC assessment, Dr. Delcour stated:

> Records in file show impaired memory and attention/concentration. Records show guarded demeanor. Although WISC and WIAT scores from 2013 show findings in the normal/average range, a [vocational] rehab letter from 9/2022 notes [claimant] reportedly has been terminated from multiple jobs, in part due to having asked too many questions and for having been too slow. Records note [claimant] is taking Prozac and Adderall. [Claimant] reports occasional impulsivity. Records note [claimant] qualified for special education services under the category of Autism. A psych eval from 2012 notes [claimant] was noted to relate in an awkward manner. In the [vocational] rehab letter from 9/2022, it was opined that, "I found him eligible for BVR services due to having significant functional limitations in the areas of: Communication, Interpersonal Skills, Self-Direction, and Work Tolerance." Grandmother reports in a current clarifying phone call that the [claimant] struggles to deal with stress and changes to his routine. The limitations noted above take into account the reported symptoms and the objective evidence in file.

(Tr. 70.)

Upon reconsideration on March 6, 2023, state agency psychological consultant Barry Rudnick, M.D., completed a PRT and mental RFC assessment.  (Tr. 76-80.)  Included among the records reviewed upon reconsideration by Dr. Rudnick was a January 20, 2023, BVR letter, which was summarized as stating that:

> [Mr. Klein] has been participating in job search services & secured PT employment as crew member of Auntie Anne's Pretzels as of 10/28/2022, initial received job coaching services when he started work to help learn duties and acclimate to working.  Assuming he continued to have stable employment, BVR case is set to close 2/7/2023.

10

(Tr. 77.)  Dr. Rudnick's PRT and mental RFC assessment were similar to Dr. Delcour's, except that he observed in his mental RFC assessment: "To the extent the claimant might have adhd/cognitive issues in a work setting he should avoid inherently hazardous work activities without appropriate safeguards and supervision."  (Tr. 79.)

**D.      Lay Witness Reports**

**1.      Renee Klein**

On January 14, 2023, Renee Klein, Mr. Klein's grandmother completed a "Function Report – Adult." (Tr. 245-53, 254-62 (duplicate).)  She reported:

> [Mr. Klein] [n]eeds extra time to complete tasks along with <u>very</u> <u>specific</u> <u>repetitive</u> <u>direction</u>.  Can be impulsive, can have uncoordinated repetitive movements.  No filter.  Change in routine or stress or anxiety will cause meltdown.  He will sit on the floor anywhere [and] cry.  Startles with loud noise or accidently touched by someone.  Different textures of materials or hot vs cold water are very unsettling to him.  Has difficulty understanding others['] emotions or their sarcasium [sic].  Also, his depression can stop him in his track and will stay in bed for days.

(Tr. 245 (emphasis in original).)  She reported he could handle self-care independently but needed reminders.  (Tr. 247.)  She ordered and picked up his medication and put his medication in daily pill boxes.  (Tr. 248.)  He could prepare simple meals for himself but it took him longer and it was hard for him to stay on task.  (*Id*.)  He did some laundry, household chores, and yardwork, but he needed extra time and constant reminders to stay on task and specific instructions.  (*Id*.)  She reported that he interacted with small groups of friends to play Dungeons and Dragons, and to role play weekly.  (Tr. 250.)   He occasionally babysat for his 10- and 12-year-old half-brothers and went to dinner every few months with his mother and every couple of weeks with his father.  (*Id*.)  She indicated that Mr. Klein's ability to complete tasks and concentrate, understand, and follow instructions were limited due to his autism.  (Tr. 251.)  She said he handled stress poorly, stating he would melt down, cry, and lock himself in his room for

11

a while.  (Tr. 252.)  He took Adderall and Prozac, with side effects from Adderall listed as loss of appetite and frequent migraines.  (Tr. 253.)

### 2. Elizabeth Jenkins

On September 16, 2023, Elizabeth Jenkins, General Manager for Mr. Klein's employer Auntie Anne's, provided a letter regarding Mr. Klein's employment with Auntie Anne's.  (Tr. 297.)  She stated that Mr. Klein had been working for Auntie Anne's since October 2022 and was a "great employee" who worked well with his coworkers but also "face[d] some daily challenges."  (*Id*.)  She said: Mr. Klein "seem[ed] to only be able to do one task at a time with constant supervision"; he had "difficulty with sensitivity to water temperatures and some equipment with skin contact"; and "interaction with customers [could] be difficult for him" at times.  (*Id*.)  She stated that she noticed a change in his behavior when they were busy or if he was scheduled to work more than one shift a week, noting that his "anxiety peak[ed] during [those] times."  (*Id*.)  She also said he did not "seem to do well with shifts longer than 4 hours at a time" and she felt that "if he work[ed] more than 2 shifts a week he struggle[d]."  (*Id*.)  She said Mr. Klein's coworkers were aware of these challenges and "help[ed] remind him of daily tasks."  (*Id*.)  She also said that Mr. Klein was "offer[ed] breaks if he seem[ed] over stimulated with whatever situation he [was] having a hard time with."  (*Id*.)  Finally, she said: "Overall, we enjoy having him apart of our crew and will continue being patient and understanding with [his] needs."  (*Id*.)

### E. Hearing Testimony

### 1. Plaintiff's Testimony

At the September 29, 2023 hearing, Mr. Klein testified in response to questioning by the ALJ and his attorney.  (Tr. 40-54.)  He said he had never lived independently and was living with

his grandmother at the time of the hearing.  (Tr. 41, 49.)  He had a driver's license and drove to work twice a week, but he only drove if his parents were with him because he could not "focus enough to drive."  (*Id.*)  He testified that his inability to work was due solely to his mental health, not physical conditions, and he explained that his need for constant supervision, his need for frequent breaks, his tendency to get overstimulated, and his sensitivity to heat and cold interfered with his ability to work.  (Tr. 42-43.)  In addition to heat/cold sensitivity, Mr. Klein reported being sensitive to certain textures, stating it made his "brain get overstimulated."  (Tr. 48-49.)  For instance, he recounted a time when he went couch shopping with his grandmother and he was unable to sit on half the couches they looked at because the textures made him "physically uncomfortable."  (*Id.*)

Mr. Klein testified that he needed to set constant reminders and leave notes for himself to remember to perform daily self-care tasks such as brushing his teeth, bathing, and taking his medication.  (Tr. 43.)  His grandmother picked up his medication and called him each day to remind him to take his pills.  (Tr. 49.)  He reported that medication side effects included feeling jittery and loss of appetite.  (Tr. 48.)  He also said he had problems with migraines and feeling nauseous.  (Tr. 48, 53.)  He felt his migraines might be stress-related because they were not consistently occurring.  (Tr. 53.)  He said he might have one every day or every week and then he might not have one for two months.  (*Id.*)  When he had a migraine, he treated it with over-the-counter pain medication like Advil or Tylenol and laid down with the lights off.  (Tr. 53-54.)

Mr. Klein spent time on Sundays playing Dungeons and Dragons for three hours with four or five friends who he had known for about two years.  (Tr. 43, 49.)  He also attended LARP (live action role play) at a park once a month in Columbus.  (Tr. 45.)  LARP lasted two or three hours and was similar to Dungeons and Dragons but was in-person.  (Tr. 45-46.)  His

13

grandmother or father drove him to meet with his friends to play Dungeons and Dragons on Sunday and to attend LARP in Columbus.  (Tr. 43-44, 45.)  In his free time at home, he watched television, played video games against the computer for about two hours a day, sewed costumes for LARP once every two months, and painted miniature Dungeon and Dragons figurines once or twice a month for about two hours at a time.  (Tr. 44, 46.)  He said some days it was easier than other days to follow along with the plot of a television show.  (Tr. 44.)

Mr. Klein explained that some days it was easy for him to focus and other days it was "an actual like task to focus."  (Tr. 49-50.)  He also said that some days his depression "hit[] [him] like a freight train" and he could not get out of bed, while, on other days, he was able to get out of bed and do things.  (Tr. 50.)   Depending on his level of depression, he said that there could be days that he did not attend LARP, meet with his friends, or engage in other hobbies.  (*Id*.)  He noted that nothing was consistent about how he felt; each day was different, and he did not know when his depression would hit him to the point of him just lying in bed.  (Tr. 50, 53.)  He said he handled stress poorly and had "little meltdowns like a toddler would" and would sit on the floor or lock himself in his room because he could not handle his emotions well and would get to the point when his "brain shuts down literally."  (Tr. 54.)

Mr. Klein testified that he could make change and count money but was not good at managing money, explaining there were multiple times that he had overdrawn his account by hundreds of dollars.  (Tr. 46-47.)  He said his grandmother did most of the household chores, noting he could not do dishes because of his heat/cold sensitivity issues; as far as other chores, he had a hard time remembering what needed to be done without a written list with step-by-step instructions.  (Tr. 47.)  He helped with yardwork occasionally, but needed his father to be there to provide him with directions as to what needed to be done.  (Tr. 48.)  He explained he was able

14

to make the costumes for LARP by following and watching the steps multiple times on YouTube.  (Tr. 47-48.)

Mr. Klein was working part-time, and he said his schedule was usually two four-hour shifts each week.  (Tr. 41, 50-51.)  During a four-hour work shift, he typically needed to take three or four breaks for four or five minutes at a time to "reset" himself and return to work mentally.  (Tr. 51.)  He said the number of breaks he needed while working was dependent on how his day was going, how busy it was at work, and how his depression and anxiety were that day; some days he might need one break, and other days he might need five breaks.  (*Id*.)  He tried working at a pizza shop, but it did not last long due to his heat/cold sensitivity issues; he would come home from work physically and mentally exhausted.  (*Id*.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 54-60.)  He classified Mr. Klein's past work as a machine operator, which was normally considered semi-skilled, medium level work.  (Tr. 55-56.)  In response to the ALJ's second hypothetical (Tr. 57) which mirrored the ALJ's RFC assessment (Tr. 20), the VE testified that the described individual could not perform Mr. Klein's past work but could perform unskilled jobs such as packager, kitchen helper, and marker (Tr. 57-58).[8]  The VE testified that all work would be precluded if the individual identified in the second hypothetical would be off task twenty percent of an eight-hour workday and/or absent from work two days per month.  (Tr. 58.)  The VE also testified that all work would be precluded if the individual identified in the second hypothetical required constant supervision, required the ability to take unscheduled breaks once per hour for five to ten minutes,

---

[8] The packager and kitchen helper positions were medium exertional level jobs, and the marker position was a light exertional job.  (Tr. 57.)

or would physically sit down on the floor and stop working for short periods of time during periods of high stress.  (Tr. 59-60.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

### IV.     The ALJ's Decision

In his October 17, 2023 decision, the ALJ made the following findings:[10]

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2023. (Tr. 17.)

2.      The claimant has not engaged in substantial gainful activity since June 22, 2022, the alleged onset date. (*Id.*)

3.      The claimant has the following severe impairments: autism spectrum disorder / Asperger's syndrome; depression; anxiety; and attention deficit hyperactivity disorder (ADHD).[11] (Tr. 17-18.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18-20.)

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes, or scaffolds; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle;

---

[9] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[10] The ALJ's findings are summarized.

[11] The ALJ found Mr. Klein's obesity was a non-severe impairment but considered the non-severe impairment in limiting Mr. Klein to less than a full range of work at all exertional levels. (Tr. 18.)

17

frequently be exposed to extreme cold and extreme heat; has the ability to understand, remember, and carry out simple instructions; able to use his judgment to make simple work-related decisions; cannot perform work requiring a specific production rate (i.e. assembly line work); able to deal with occasional changes in a routine work setting; and able to occasionally interact with supervisors, coworkers, and the public. (Tr. 20-24.)

6.     The claimant is unable to perform any past relevant work. (Tr. 24.)

7.     The claimant was born in 2002, and was 19 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (*Id.*)

8.     The claimant has at least a high school education. (*Id.*)

9.     Transferability of job skills is not material to the determination of disability. (Tr. 25.)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in national economy that the claimant can perform, including packager, kitchen helper, and marker. (*Id.*)

Based on the foregoing, the ALJ determined that Mr. Klein was not under a disability, as defined in the Security Act from June 22, 2022, through the date of the decision. (Tr. 26.)

## V.     Plaintiff's Arguments

Plaintiff presents three assignments of error. First, he argues the ALJ failed to provide a full and fair review of the evidence because material evidence was omitted from the exhibited file and not proffered to Mr. Klein or his counsel to review. (ECF Doc. 8, pp. 14-15.) Second, he argues the ALJ failed to properly evaluate the persuasiveness of the medical opinion evidence because he failed to adequately address the consistency and inconsistency of the opinion evidence with all of the evidence of record. (*Id.* at pp. 15-20.) Third, he argues the ALJ improperly discredited his subjective reports of symptoms. (*Id.* at pp. 21-23.)

## VI.     Law & Analysis

**A.     Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: The Commissioner's Failure to Exhibit a Letter Did Not Prevent a Full and Fair Review of the Evidentiary Record**

In his first assignment of error, Mr. Klein argues that the evidentiary record exhibited and proffered to counsel by the Social Security Administration ("SSA") was incomplete, which in turn prevented a full and fair review of the record. (ECF Doc. 8, p. 14.) Specifically, he notes that the explanation provided by Dr. Rudnick, the state agency psychological examiner at the reconsideration level, in support of his March 6, 2023 medical opinion findings indicates that Dr. Rudnick reviewed a BVR letter that was summarized as follows:

> BVR
> 1/20/23 Letter: has been participating in job search services & secured PT employment as crew member of Auntie Anne's Pretzels as of 10/28/2022, initial received job coaching services when he started work to help learn duties & acclimate to working. Assuming he continues to have stable employment, BVR case is set to close 2/7/2023.

(Tr. 77 ("January 2023 BVR letter").) Mr. Klein asserts that the SSA hearing office staff were required to exhibit this letter in the "E" folder of the claims file according to the Hearings,

Appeals, and Litigation Law Manual ("HALLEX"), and that "[t]he appropriate remedy for an ambiguous or incomplete record is remand."  (ECF Doc. 8, p. 14 (citations omitted).)  He therefore requests remand "for the state agency to proffer the referenced evidence and give Mr. Klein the opportunity to review and properly incorporate it into his claims."  (*Id*. at p. 15.)

The Commissioner agrees that "the January 2023 letter was not in the file," but notes that Mr. Klein did not argue at his administrative hearing that the record was incomplete; indeed, his attorney confirmed to the ALJ that the record was complete.  (ECF Doc. 10, p. 9 (citing Tr. 37).)  Further, the Commissioner asserts that there is no law establishing that a failure to follow HALLEX, an internal manual, is a basis for remand (*id.* at p. 11), and that Mr. Klein has failed to show that the omission of the letter from the record resulted in prejudice (*id.* at pp. 9-10).

HALLEX is an internal manual through which the Commissioner "provides 'guiding principles, procedural guidance and information' to adjudicators and staff" at SSA hearing offices.  *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 397 (6th Cir. 2008) (quoting HALLEX II-5-3-2); *see Creech v. Comm'r of Soc. Sec.*, 581 F. App'x 519, 520 (6th Cir. 2014).  HALLEX is not binding on reviewing courts in the Sixth Circuit.  *See Bowie*, 539 F.3d at 399.  While the Sixth Circuit has not provided guidance as to whether a petitioner may properly seek relief in federal court based on alleged non-compliance with HALLEX, the Sixth Circuit has observed that "even district courts that have granted relief for failure to comply with HALLEX have required that the plaintiff demonstrate prejudice from the failure to follow the procedures."  *Creech*, 581 F. App'x at 521 (citing *Lawrence v. Colvin*, No. 3:13-032-D CR, 2014 WL 640990, at *4 (E.D. Ky. Feb 18, 2014) (citing cases)).  Although not directly on point, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

The HALLEX provision cited by Plaintiff states that hearing office staff "will generally exhibit," in pertinent part, "[l]etters from employers, family members, and other individuals describing the claimant's impairments and limitations" and "[s]tate vocational reports." HALLEX section I-2-1-15(B)(5).  Mr. Klein asserts that the Commissioner's failure to exhibit and proffer the January 2023 BVR letter under those procedures was "not harmless error" because "the record is incomplete in a manner that deprives this Court and Mr. Klein[] of the ability to evaluate all of the evidence that the State Agency used to deny benefits."  (ECF Doc. 8, p. 15.)  The Commissioner responds that Mr. Klein has failed to show he suffered prejudice due to the omission of the letter from the record, noting that the ALJ: considered a September 2023 letter from Mr. Klein's employer; repeatedly acknowledged that the record detailed Mr. Klein's difficulty maintaining employment; and ultimately explained how he weighed the evidence relating to Mr. Klein's ability to function in the workplace.  (ECF Doc. 10, pp. 9-10.)

Although the January 2023 BVR letter is not in evidence, a review of the record reveals a separate August 30, 2023 letter from Susan Kuder of BVR to Plaintiff's counsel, which states:

> Harley Klein's OOD vocational rehabilitation case was successfully closed on 2-9-23 after he obtained a part-time job at Auntie Anne's Pretzels. He did require vocational rehabilitation services (assistance with interviewing for, looking for and applying for jobs, as well as on site job coaching for a time when he started working) to assist him in obtaining and retaining this job.
>
> Since his case had been closed, I have not had contact with him since his case closure.

(Tr. 449 ("August 2023 BVR letter").)  Parallel to the information provided in this August 2023 BVR letter, the summary of the January 2023 BVR letter indicated that: (1) Mr. Klein "participat[ed] in job search services" with BVR and "received job coaching services when he

started work to help learn duties & acclimate to working"; (2) he "secured [part time] employment as [a] crew member of Auntie Anne's Pretzels"; and (3) his "BVR case [wa]s set to close 2/7/2023" if he "continue[d] to have stable employment."  (Tr. 77.)  The only information from the summary of the January 2023 BVR letter that is not also included in the August 2023 BVR letter is the fact that Mr. Klein obtained his Auntie Anne's job "as of 10/28/2022."  (*Id.*)

Mr. Klein offers no specific argument as to how he was prejudiced by the exclusion of the January 2023 BVR from the record, and does not acknowledge or address the apparent availability of nearly all the same information in another letter from BRV that was received by his counsel and exhibited by the hearing office.  (Tr. 449.)  While Mr. Klein states that the January 2023 BVR letter "reported limitations in [hi]s independent vocational capabilities, which would also presumably have included testing to evaluate the need for assistance, which assistance was reportedly provided by BVR" (ECF Doc. 8, p. 12), he offers no grounds for his speculation that the letter would include information regarding additional testing that was not mentioned in the summary.  Further, although his counsel had an opportunity to review the record in advance of the administrative hearing (Tr. 102), he did not bring the missing evidence to the ALJ's attention at the hearing, instead confirming that the record was complete (Tr. 36-37).  There is also no evidence suggesting that Mr. Klein made other efforts to obtain a copy of the missing letter during his appeal to the Appeals Council or these federal court proceedings. Judging from the only information presently before this Court, the summary considered by Dr. Rudnick, there is no evidence that the January 2023 BVR letter contained information that was materially different from the information contained in the final evidentiary record.  Accordingly, the Court concludes that Mr. Klein has failed to demonstrate prejudice resulting from the Commissioner's failure to exhibit the January 2023 BVR letter and proffer it to Plaintiff.

The district court cases cited by Plaintiff for the proposition that "[t]he appropriate remedy for an ambiguous or incomplete record is remand" do not alter this analysis.  In those cases, the Commissioner had terminated disability benefits for an incarcerated individual, rather than merely suspending and later reinstating benefits, even though the individual alleged that his incarceration lasted less than twelve months.  *See Pursley v. Saul*, No. 1:19-cv-2459, 2020 WL 3513675, at *5-7 (N.D. Ohio June 2, 2020), *report and recommendation adopted*, 2020 WL 3512852 (N.D. Ohio June 29, 2020); *Smith v. Astrue*, No. 1:11-cv-778, 2012 WL 5268712 (S.D. Ohio Oct. 23, 2012), *report and recommendation adopted sub nom. Smith v. Comm'r of Soc. Sec.*, 2012 WL 5600951 (S.D. Ohio  Nov. 15, 2012).[12]  In *Smith*, the court found the plaintiff had "consistently presented his legal argument" that his prior award of benefits was improperly terminated, and "the ALJ stated that she would obtain the necessary records and review Plaintiff's argument but apparently failed to do so[.]"  2012 WL 5268712, at *6.  In those circumstances, the court determined that it "must remand" for further development of the record relevant to the plaintiff's argument that benefits were improperly terminated.  *Id.*  In *Pursley*, the court similarly found "[t]he hearing record confirms the ALJ told [the plaintiff's] counsel she would determine why his benefits were not automatically reinstated but failed to address this issue in her Decision," and further concluded that the evidence established the plaintiff was incarcerated for less than twelve months and thus entitled to an automatic resumption of benefits.  2020 WL 3513675, at *6-7.  In those circumstances, the court found the appropriate remedy was remand for further development of the record relevant to the plaintiff's arguments.  *Id.* at *7.

---

[12] Plaintiff also cited an out-of-circuit court decision which found a duty to develop the record in relation to the termination of disability benefits when a prisoner alleged he was incarcerated less than twelve months and the record contained ambiguous evidence regarding the prior grant of benefits, the length of the incarceration, and the suspension and/or termination of benefits.  *See Bonner v. Astrue*, 725 F.Supp.2d 898 (C.D. Cal. 2010).

Here, in contrast to *Pursley* and *Smith*, the record does not reflect that Plaintiff made the ALJ aware of missing evidence material to his entitlement to benefits, let alone that the ALJ thereafter failed to gather the relevant evidence as promised or to appropriately address the disputed issue in his decision.  Instead, Plaintiff was given an opportunity to review the record (Tr. 102), his counsel confirmed that the record was complete (Tr. 37), and Plaintiff apparently made no further efforts to obtain a copy of the missing evidence.  Further, the available information regarding the January 2023 BVR letter suggests that another document in evidence, the September 2023 BVR letter, contains materially the same information regarding Mr. Klein's use of BVR services to obtain his job at Auntie Anne's.  (Compare Tr. 77 with Tr. 449.)  Neither *Pursley* nor *Smith* support a finding that ALJ in this case committed harmful error in failing to ensure that the missing letter was exhibited or that Mr. Klein was prejudiced by the omission.

For the reasons set forth above, the Court finds that the ALJ did not fail to provide a full and fair review of the evidence.  Accordingly, the first assignment of error is without merit.

**C.  Second Assignment of Error: The ALJ Adequately Evaluated the Consistency of the State Agency Psychological Consultant and Treating Provider Medical Opinions**

In his second assignment of error, Mr. Klein argues that "the ALJ failed to properly evaluate the consistency of opinion evidence with *all* of the evidence of record."  (ECF Doc. 8, p. 15 (emphasis in original).)  Specifically, he says the ALJ: (1) did not adequately explain why he found the medical opinions of the state agency psychological consultants more persuasive than his treating psychiatrist, Dr. Anikeev, and ignored evidence that was inconsistent with those opinions; and (2) ignored evidence that was consistent with Dr. Anikeev's medical opinion.  (*Id.* at pp. 16-20.)  The Commissioner argues in response that the ALJ properly evaluated the medical opinion evidence and articulated the reasons for his findings, specifically discussing consistency

and reasonably concluding that the state agency psychological consultants' opinions were more persuasive than Dr. Anikeev's opinion.  (ECF Doc. 10, pp. 11-20.)

### 1.     Legal Framework for Evaluating Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

26

The undersigned turns to whether the ALJ's evaluation of the medical opinions of state agency psychological consultants Drs. Delcour and Rudnick and treating psychiatrist Dr. Anikeev satisfied the regulatory framework for evaluation of medical opinion evidence.

### 2. The ALJ Adequately Evaluated the Persuasiveness of the State Agency Psychological Consultants' Medical Opinions

The ALJ evaluated the opinions of state agency psychological consultants Drs. Delcour and Rudnick as follows:

> The undersigned is <u>persuaded</u> by the opinions of the State agency psychiatric medical consultants Karla Delcour, Ph.D., and Barry Rudnick, M.D. Both Dr. Delcour, on initial determination, and Dr. Rudnick, on reconsideration, opined that the claimant had moderate limitations in all four areas of mental functioning (2A; 4A). They also opined that the claimant could complete simple and routine tasks in a predictable work environment where pace is not fast and there are no strict time or production quotas, occasionally and superficially interact with others, and work in an environment where major changes are infrequent (2A; 4A). <u>This assessment is consistent with the medical evidence. The record shows some problems with memory, distractibility, and difficulty adapting to changes (3F; 5F; 6F; 7F; 10F).</u> These symptoms would create limitations completing simple and routine tasks, tolerating changes, and performing work with production quotas. <u>Also, the claimant's history of autism and problems interacting with others suggests that the claimant would have limitations in this area (1F).</u> Therefore, the undersigned finds these opinions persuasive.

(Tr. 22-23 (emphasis added).)  Mr. Klein raises two challenges to the ALJ's analysis of the state agency psychological consultants' opinions.  (ECF Doc. 8, pp. 17-19.)  First, he argues the ALJ only "vaguely cited to multiple exhibits, in their entirety," and did not provide "precise point cites . . . to support" his finding.  (*Id*. at p. 17.)   Second, he argues that the opinions of the state agency psychologists "are inconsistent with substantial evidence of record" and that the ALJ erred by failing to discuss those inconsistencies.[13]  (ECF Doc. 8, pp. 17-18.)  The Court will address each argument in turn.

---

[13] Mr. Klein challenges the ALJ's consideration of consistency, but not supportability.  (ECF Doc. 8, pp. 17-19.) Thus, any argument that the ALJ did not properly consider supportability is waived and will not be considered. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) (limiting the court's "consideration

First, Mr. Klein argues that remand is required because the ALJ only "vaguely cited to multiple exhibits, in their entirety," and did not provide "precise point cites . . . to support" his finding that the opinions were consistent with the medical evidence.  (ECF Doc. 8, p. 17.)  He apparently refers to the ALJ's citation to several exhibits in support of his observation that "[t]he record shows some problems with memory, distractibility, and difficulty adapting to changes." (Tr. 22.)  But even a cursory review of the ALJ's earlier summary of the medical records reveals specific pinpoint citations to records reporting "impaired immediate memory" and "impaired concentration" (Tr. 19, 21), distractibility and inability to finish tasks when not taking medication (Tr. 21), inability to adjust to changes (*id.*), and difficulty staying on task (Tr. 22). An ALJ may rely on previously articulated information to support his opinion analysis, and need "not reproduce the list of . . . treatment records a second time."  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *see Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  Plaintiff has thus failed to show that the ALJ's general citations in support of his opinion analysis constituted reversible error.[14]

Second, Mr. Klein argues that the state agency opinions "are inconsistent with substantial evidence of record," including the treating psychiatrist's opinion, and that the ALJ failed to adequately consider the inconsistent record evidence in evaluating the persuasiveness of the opinions.  (ECF Doc. 8, pp. 17-19.)  Specifically, he argues the opinions are inconsistent with:

_____

to the particular points that [claimant] appeared to raise in [his] brief on appeal"); *see also McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

[14] *See also Duke v. Comm'r of Soc. Sec.*, No. 21 CV 39, 2022 WL 1075171, at *3 (N.D. Ohio Apr. 11, 2022) ("While the Court agrees that the ALJ could have aided subsequent review by providing pinpoint citations for . . . [the ALJ's] findings, the record does in fact show such findings.").

- A teacher questionnaire and an individual assessment by a school psychologist, both prepared in 2014 (*id.* at pp. 17-18 (citing Tr. 178, 179, 181, 196));

- A psychological evaluation completed by Dr. Matzke in 2012 (*id.* at p. 18 (citing Tr. 307, 312-14));

- A function report completed by Mr. Klein's grandmother (*id.* (citing Tr. 245)); and

- The treatment notes of his psychiatrist (*id.* at p. 19 (citing Tr. 363-64)).

The Commissioner argues in response that evidence predating the alleged onset of disability "is of limited relevance," and that the ALJ adequately articulated his consideration of Mr. Klein's childhood diagnosis and interventions, Dr. Matzke's report, and the function report from Mr. Klein's grandmother.  (ECF Doc. 10, pp. 18-20 (quoting *Gore v. v. Comm'r of Soc. Sec.*, No. 5:20-CV-341, 2021 WL 3673196, at *4 n. 3 (N.D. Ohio Aug. 19, 2021).)

Consistent with the Commissioner's argument, the ALJ did explicitly consider and analyze Dr. Matzke's 2012 psychological evaluation, explaining:

> The undersigned is somewhat persuaded by the opinion of consultative examiner Michelle Matzke, Psy.D. (1F). On September 5, 2012, Dr. Matzke evaluated the claimant when they were 10 years old for autism spectrum disorder. After the evaluation, Dr. Matzke made some lifestyle, education, and medical recommendations. Some of the recommendations included implementing a structured routine at home, redirection or prompts, increased opportunities for socialization, talking to the claimant's school about an Individual Education Program (IEP), and individual, family, and group therapy (1F). The undersigned is somewhat persuaded by this opinion for the following reasons. First, the extensive testing that Dr. Matzke conducted helped establish the claimant's autism diagnosis. Also, the recommendations Dr. Matzke purposed are helpful for individuals with autism to engage socially and for families trying to improve certain autism-related symptoms. However, this report was authored in 2012 when the claimant is 10 years old.  There is nothing in the evidence to show that the claimant's symptoms as a child were ongoing into adulthood.  Even if the claimant's symptoms were the same, there is nothing in Dr. Matzke's report that suggests the claimant would have difficulty working as an adult. Therefore, the undersigned is somewhat persuaded by this opinion.

(Tr. 23 (emphasis added).)  Thus, the ALJ acknowledged the intrinsic value of Dr. Matzke's findings for establishing Mr. Klein's diagnosis when he was 10 years old, and for proposing

measures to assist him with improving his autism-related symptoms at that time.  But the ALJ also appropriately recognized the limited value of an assessment that is more than ten years old, and which was completed when an adult claimant was a child.  Thus, the ALJ appropriately addressed any inconsistency between the state agency opinions and Dr. Matzke's opinion.

The ALJ also explicitly considered the function report completed by Mr. Klein's grandmother, explaining:

> Additionally, the undersigned has considered the Adult Function Reports from the claimant's grandmother . . . . The claimant's grandmother reported that the claimant can be impulsive, needs extra time to complete tasks, has difficulty understanding other peoples' emotions or sarcasm, and has problems with people touching them and loud noises (6E; 7E). . . . <u>Although th[is] individual[] ha[s] a long-term relationship with the claimant and ha[s] intimate knowledge about [his] daily functioning, the[] opinion[ is] against the great weight of the evidence. The medical evidence overwhelmingly shows that the claimant's mental health symptoms were stable</u> (2F; 3F; 4F; 5F; 6F; 10F). Therefore, the undersigned finds th[is] opinion[] somewhat persuasive.

(Tr. 23-24 (emphasis added) (discussion of separate lay opinion omitted).)  Prior to this analysis, the ALJ had more specifically discussed Mr. Klein's treatment records, highlighting mental status findings from those visits and provider notes indicating that Mr. Klein's symptoms were "fairly stable" with medication.  (Tr. 21-22.)  Thus, the ALJ also appropriately acknowledged and addressed any inconsistency between the state agency opinions and the function report.

As to the clinical findings and other provider observations from Mr. Klein's September 14, 2022 treatment visit with Dr. Anikeev, the ALJ specifically highlighted: Mr. Klein's report that he had been "fairly stable on current medications"; Dr. Anikeev's assessment of "minimal" stress and "occasional" impulsivity; and clinical findings of "anxious mood, constricted affect, impaired immediate memory, and impaired concentration."  (Tr. 21 (citing Tr. 362, 363, 364).)  Mr. Klein is correct that the ALJ did not also recognize a "Clinical Global Impression" in the same record that characterized the severity of his illness as "Markedly Ill."  (ECF Doc. 8, p. 19

(citing Tr. 364).)  But the ALJ did specifically address Dr. Anikeev's medical source statement, which opined that Mr. Klein was markedly limited in various categories of mental functioning; the ALJ found the opinion not persuasive in part because "Dr. Anikeev's own treatment notes show that the claimant's mental health symptoms were mostly stable."  (Tr. 23.)  The ALJ was not required to "discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curium)).  In the context of the whole decision, the Court finds the ALJ adequately addressed findings from Dr. Anikeev's medical records that were arguably inconsistent with the opinions of the state agency psychological consultants.

Mr. Klein is also correct that the ALJ did not specifically discuss his elementary school records from 2014, including a teacher questionnaire and a school psychologist assessment.  (ECF Doc. 8, pp. 17-18.)  But the ALJ did discuss Mr. Klein's childhood diagnosis and other findings from Dr. Matzke's 2012 evaluation, as well as a 2019 medical record that outlined Mr. Klein's earlier participation in childhood programs to build his social skills and improve his autism symptoms.  (Tr. 21.)  Further, the ALJ specifically highlighted the limited value of records that set forth the childhood symptoms of someone who is now an adult.  (Tr. 23.)

The Sixth Circuit has observed that evidence predating an alleged onset date is not "necessarily irrelevant" because it "may help establish disability" when it is "evaluated in combination with later evidence[.]"  *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) (emphasis removed).  Nevertheless, it is also true that "opinions that predate the alleged onset of disability are of limited relevance."  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008); *cf. Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th

31

Cir. 2004) ("Evidence of disability obtained after the expiration of insured status is generally of little probative value.").  Here, the ALJ acknowledged Mr. Klein's childhood diagnosis and certain of his childhood symptoms and treatment, but noted the absence of evidence establishing that the same symptoms continued into adulthood.  (Tr. 21, 23.)  He was not required to discuss each piece of evidence, but rather to "consider the evidence as a whole and reach a reasoned conclusion."  *Boseley*, 397 F. App'x at 199 (citing *Kornecky*, 167 F. App'x at 507-08).  Given the limited relevance of an elementary school assessment in determining the mental functioning of an adult ten years later, and considering the ALJ's explicit recognition and analysis of other evidence relating to the individual's childhood functioning, the Court concludes that the ALJ adequately addressed childhood evidence that may have been characterized as inconsistent with the opinions of the state agency psychological consultants.

For all of the reasons set forth above, the Court finds the ALJ sufficiently articulated his persuasiveness finding as to the state agency psychological consultants' opinions, supported that reasoning with substantial evidence, and did not ignore other evidence of record that may have been considered inconsistent with the state agency opinions.

### 3.    The ALJ Adequately Evaluated Dr. Anikeev's Opinion

The ALJ evaluated the medical opinion of treating psychologist Dr. Anikeev as follows:

The undersigned is <u>not persuaded</u> by the opinion of Michael Anikeev, M.D., and Laura Negri, RNA (9F). This medical source statement was signed by both the claimant's physician and nurse, but for clarity, the undersigned will attribute this opinion to Dr. Anikeev. On February 22, 2023, Dr. Anikeev opined that the claimant had moderate to marked limitations understanding, remembering, and applying information, mild to extreme limitations interacting with others, moderate to extreme limitations concentrating, persisting, or maintaining pace, and mild to extreme limitations adapting or managing themselves (9F). Dr. Anikeev also stated that the claimant has Aspger's syndrome and ADHD, predominantly inattentive (9F). <u>The undersigned is not persuaded by this opinion for the following reasons.</u> <u>First, this is a pre-printed form with checkboxes for the evaluating physician to</u> <u>indicate the claimant's level of impairment. There is no narrative or explanation as</u>

to why Dr. Anikeev found the level of limitations they did.  Second, Dr. Anikeev
stated that they had only been treating the claimant for five months. While this
length of a treating relationship does give Dr. Anikeev insight as to the claimant's
mental functioning, it does not represent a prolonged treating relationship.
Additionally, the medical record does not support any marked or extreme
limitations. Dr. Anikeev's own treatment notes show that the claimant's mental
health symptoms were mostly stable (4F; 6F; 7F; 9F). Therefore, the undersigned
is not persuaded by this opinion.

(Tr. 23 (emphasis added).)  Mr. Klein raises specific challenges to each of the ALJ's stated

reasons for finding Dr. Anikeev's opinion not persuasive.  (ECF Doc. 8, pp. 19-20.)

First, Mr. Klein challenges the ALJ's observation that Dr. Anikeev provided "no

narrative or explanation" for the stated limitations, arguing that Dr. Anikeev identified several

diagnoses to support his findings.  (ECF Doc. 8, p. 19.)  The Commissioner responds that a mere

diagnosis is insufficient to provide narrative support for a medical opinion, especially since the

checkbox form completed by Dr. Anikeev specifically stated that "a simple recitation of the

diagnosis" would not be sufficient to support the opinion.  (ECF Doc. 10, p. 14 (citing Tr. 432).)

Consistent with the Commissioner's arguments, the checkbox form completed by Dr.

Anikeev concludes with the following statement (in bold type):

It is imperative that you provide an explanation of the medical and clinical findings
that support your assessment of limitations – a simple recitation of the diagnosis
will not be sufficient to comply with Social Security's regulations.

State the diagnosis and medical and clinical findings that support this assessment:

(Tr. 432 (emphasis removed).)  These instructions align with applicable law, which provides that

"an ALJ may properly give little weight to a medical source's check-box form of functional

limitations when it does not cite clinical test results, observations, or other objective findings."

*Kreilach v. Comm'r of Soc. Sec.*, 621 F. Supp. 3d 836, 847 (N.D. Ohio 2022) (citing *Ellars v.*

*Commissioner of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (collecting cases)).  Indeed,

the Sixth Circuit has "characterized an opinion expressed in a check-box form, without any

33

further explanation to support the treating physician's conclusions, as 'weak evidence[.]'" *Pruitt v. Comm'r of Soc. Sec.*, No. 22-5152, 2022 WL 4517094, at *4 (6th Cir. Sept. 28, 2022) (quoting *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016) (collecting cases)). The ALJ accordingly did not err in basing his persuasiveness analysis in part on the use of a checkbox form without supporting clinical test results, observations, or other objective findings, and accurately observed that Dr. Anikeev had provided "no narrative or explanation" in support.

Second, Mr. Klein challenges the ALJ's observation that Dr. Anikeev's five-month-long treating relationship with Mr. Klein "does give Dr. Anikeev insight as to the claimant's mental functioning," but "does not represent a prolonged treating relationship." (Tr. 23.)  If the treating relationship was long enough to provide insight into his mental functioning, Mr. Klein argues that the ALJ failed to adequately explain why he found the opinion not persuasive.  (ECF Doc. 8, p. 20.)  The Commissioner responds that the ALJ provided sufficient explanation when he found that a treating relationship spanning four visits could provide some insight but did not represent a prolonged relationship.  (ECF Doc. 10, p. 14.)  The Court agrees.  Although supportability and consistency are the most important factors to be considered in a persuasiveness analysis, the length of the treating relationship is also an appropriate factor to consider.  20 C.F.R. §§ 404.1520c(b)(2); 404.1520c(c)(i).  Here, the ALJ appropriately observed that Dr. Anikeev was in a position to provide some insight into Mr. Klein's mental functioning, but not as much insight as he might have been able to provide if he had treated Mr. Klein for a prolonged period.

Finally, Mr. Klein argues that the ALJ's finding that "the medical record did not support any marked or extreme limitations" consistent with Dr. Anikeev's opinion findings "is not true." (ECF Doc. 8, p. 20.)  In support, he points to the same evidence he described as inconsistent with the state agency opinions, including the 2014 school records, the 2012 psychological evaluation,

and Dr. Anikeev's record notation characterizing the severity of Mr. Klein's mental illness as
"Markedly Ill" in September 2022.  (*Id.*)  For the reasons articulated in Section VI.C.2., *supra*,
the Court finds that the ALJ appropriately addressed the described evidence and adequately
explained the basis for his persuasiveness finding.  While Mr. Klein may feel that childhood
records from a decade ago do support a finding of "marked or extreme limitations," the ALJ
adequately acknowledged Mr. Klein's childhood diagnoses, symptoms, and treatment before
finding "nothing in the evidence to show that the claimant's symptoms as a child were ongoing
into adulthood[.]" (Tr. 23.)  It was reasonable for the ALJ to conclude that the childhood records
did not support marked or extreme limitations.  (*Id.*)  And while Dr. Anikeev may have
characterized Mr. Klein as markedly ill in his records, consistent with the findings of marked
limitations in his medical opinion, the ALJ explained that he found such opinions unpersuasive
given the lack of a "narrative or explanation" to support the level of limitation, the limited
treating relationship, and the fact that "Dr. Anikeev's own treatment notes show that the
claimant's mental health symptoms were mostly stable."  (*Id.*)  It was reasonable for the ALJ to
conclude that Dr. Anikeev's medical records did not support marked or extreme limitations.

For the reasons set forth above, the Court finds the ALJ sufficiently articulated his
persuasiveness finding as to Dr. Anikeev's treating psychological opinion, supported that
reasoning with substantial evidence, and did not ignore other evidence of record that may have
been considered consistent with Dr. Anikeev's opinion.  Accordingly, the Court concludes that
Mr. Klein's second assignment of error is without merit.

**D.    Third Assignment of Error: ALJ Properly Evaluated Plaintiff's Symptoms**

In his third assignment of error, Mr. Klein argues the ALJ improperly discredited his
reported symptoms, resulting in an overestimate of his residual functional capacity.  (ECF Doc.

35

8, pp. 21-23.)  He asserts that this was not harmless error because the ALJ failed to include RFC

limitations to account for his inability to stay on task, his need for breaks, or his need for extra

supervision, which may have precluded competitive work according to the VE.  (*Id.* at p. 23.)

The Commissioner argues in response that the ALJ discussed the relevant evidence and

reasonably concluded that Mr. Klein's reported symptoms were not of the severity to preclude all

work given the evidence of record.  (ECF Doc. 10, pp. 21-24.)

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints

and may properly consider the credibility of a claimant when making a determination of

disability." *Jones*, 336 F.3d at 476; *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation*

*of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a

claimant's statement of symptoms alone is not sufficient to establish the existence of a physical

or mental impairment or a disability).  Under the two-step process used to assess the limiting

effects of a claimant's symptoms, a determination is first made as to whether there is an

underlying medically determinable physical or mental impairment that could reasonably be

expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*

*v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If

that requirement is met, the second step is to evaluate of the intensity and persistence of the

claimant's symptoms to determine the extent to which they limit the claimant's ability to perform

work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.

In undertaking the second step analysis, an ALJ should consider objective medical

evidence, a claimant's subjective complaints, information about a claimant's prior work record,

and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462,

49464-49466; 20 C.F.R. § 404.1529(c)(3).  Factors relevant to a claimant's symptoms include

daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ concluded that Mr. Klein's symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision."  (Tr. 21.)  In so finding, he considered Mr. Klein's subjective reports regarding his symptoms (Tr. 18-19, 21) and the reports of his grandmother and employer (Tr. 23-24). Consistent with SSR 16-3p, the ALJ considered the medical evidence relating to Mr. Klein's medically determinable impairments, including diagnoses, examination findings, treatment prescribed to treat his conditions, and his response to treatment.  (Tr. 21-22.)  The ALJ observed that Mr. Klein generally reported doing well on his medication regime.  (*Id.*)  Also consistent with SSR 16-3p, the ALJ considered Mr. Klein's reported daily activities, which included playing video games and watching television and YouTube videos.  (Tr. 19, 21.)  And the ALJ considered other activities that Mr. Klein engaged in, which included playing games with friends every Sunday, playing Dungeons and Dragons, playing in person costume play with a group of people monthly, sewing/creating cosplay costumes, and driving.  (*Id.*)  Further, at Step Three the ALJ concluded that Mr. Klein's mental impairments did not meet or medically equal the severity of one of the listed impairments given the ALJ's finding that Mr. Klein had no more than moderate limitation in each of the four broad areas of functioning.  (Tr. 18-19.)

Mr. Klein argues that the ALJ's analysis of his symptoms in each of the four domains of mental functioning was flawed because of both conflicting evidence and evidence that the ALJ purportedly misrepresented.  As to the domain "interacting with others," Mr. Klein argues that the ALJ mischaracterized the daily activities he cited in support of his finding of moderate

limitations because he did "not acknowledge the limited frequency and short duration" of Mr.

Klein's reported participation in the activities.  (ECF Doc. 8, pp. 21-22.)  But the ALJ provided

the following explanation for his finding that Mr. Klein had moderate limitations in this domain:

> In interacting with others, the claimant has a moderate limitation. At the hearing,
> the claimant testified that they live with their grandmother and enjoy playing games
> with their friends every Sunday. The claimant indicated that they enjoy Dungeons
> and Dragons and attends monthly in-person costume play in a park with a group of
> people (hearing testimony). Review of the medical record shows that the claimant
> worked and lived with their grandparents (3F). Early medical evidence shows that
> the claimant did have significant issues relating to other people because of their
> autism (1F). As a child, they were enrolled in programs specifically targeted to
> improving social skills (1F). Considering this evidence in a light most favorable to
> the claimant, the undersigned finds moderate limitations in this area.

(Tr. 19 (emphasis added).)  Mr. Klein's argument that the ALJ failed to acknowledge the

"limited frequency and short duration" of his participation in Dungeons and Dragons (weekly)

and live action role play (monthly) is not well taken, since the ALJ acknowledged that Mr. Klein

played games with friends every Sunday and attended in-person costume play monthly.  (*Id.*)

As to the domain of "concentrating, persisting, or maintaining pace," Mr. Klein argues

that the ALJ minimized his reported symptoms by failing to address testimony that he requires

step-by-step instructions for basic household tasks, needs to follow a written list, and needs

redirection and reminders when helping with yard work.  (ECF Doc. 8, p. 22.)  The ALJ

provided the following explanation in support of finding moderate limitations in this domain:

> With regard to concentrating, persisting or maintaining pace, the claimant has a
> moderate limitation. At the hearing, the claimant testified that they enjoy watching
> television and playing video games during the day. However, the claimant also
> stated that they have some problems with concentration (hearing testimony).
> Review of the medical record shows that the claimant had occasional problems with
> impulsivity and impaired concentration (4F/3). Other treatment notes show that the
> claimant's mental functioning improved with medication (3F; 5F; 6F; 7F). The
> record also details problems maintaining employment because the claimant is
> unable to handle changes in their work routine (5F). Considering the totality of the
> evidence, the undersigned finds that the claimant would be moderately limited in
> this area.

(Tr. 19.)  The ALJ also acknowledged, in discussing Mr. Klein's subjective complaints, his testimony "that he is unable to work because of poor concentration and memory, . . . and an inability to multitask or manage stress," has "never lived independently" and relies on his "grandmother to do all household chores and prepare all . . . meals," but also that he is "able to follow step-by-step instructions," has a driver's license, graduated from high school, and plays Dungeons and Dragons with friends.  (Tr. 21.)  The ALJ also acknowledged reports from Mr. Klein's supervisor at work that he "needs constant supervision" and "cannot work longer than 4 hours at a time."  (Tr. 23.)  Although the ALJ did not specifically discuss every part of the testimony highlighted in Mr. Klein's brief, he was not required to do so.  *See Boseley*, 397 F. App'x at 199 (citing *Kornecky*, 167 F. App'x at 507-08).  The Court finds that the subjective reports detailed in the ALJ's written decision accurately accounted for, and did not minimize, his testimony regarding his need for instructions, reminders, and redirection.

As to the domain of "adapting and managing oneself," Mr. Klein argues that the ALJ mischaracterized his testimony regarding his hobbies, which he participates in "for exceedingly limited periods of time" and sometimes cannot participate in at all.  (ECF Doc. 8, p. 22.)  He also argues that the ALJ failed to address that he "has never lived independently" and has sometimes overdrawn his bank account.  (*Id.* at p. 23.)  Finally, he argues that the ALJ failed to properly evaluate his "inability to sustain multiple jobs" and his "inability to handle stress" because the ALJ failed to explain why certain evidence—including school records, BVR records, employer reports, his grandmother's reports, and the opinion of his treating psychiatrist—does not weigh in favor of finding Mr. Klein's subjective reports credible.  (*Id.*)

In support of his finding of moderate limitations in the domain of "adapting or managing oneself," the ALJ provided the following explanation:

39

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. At the hearing, the claimant testified that they enjoy sewing clothes, pouches, costumes, and leather armor costumes. They testified that they spend their days watching television, playing games, watching YouTube videos and using the computer. The claimant also indicated that they are able to do self-care tasks, such as brushing their teeth and bathing, independently. However, the claimant relies on their grandmother to do all household chores and prepare meals (hearing testimony). Review of the medical record shows that the claimant was able to work and drive independently (4F/3). Other evidence shows that the claimant had problems maintaining employment because they were unable to adjust to changes in a routine (5F). Considering the totality of the evidence, the undersigned finds that the claimant would be moderately limited in this area.

(Tr. 19.)  The ALJ also acknowledged Mr. Klein's testimony that he had "never lived independently" and currently lived with his grandmother.  (Tr. 21.)  As with the other functional domains, the Court finds the ALJ accurately characterized Mr. Klein's testimony, including his testimony regarding hobbies and daily activities, his report that never lived independently, and his difficulty maintaining employment due to an inability to adjust to changes in routine.  While the ALJ did not specifically discuss every detail of Mr. Klein's testimony, he did "consider the evidence as a whole and reach a reasoned conclusion."  *Boseley*, 397 F. App'x at 199.

As for Mr. Klein's argument that the ALJ failed to explain why the 2012 psychological evaluation, the 2014 school records, the BVR records and letter from his employer, his grandmother's function report, and Dr. Anikeev's medical opinion did not weigh in favor of finding Plaintiff's subjective complaints credible, the Court finds for the reasons articulated above and in Sections VI.C.2. and VI.C.3., *supra*, that the ALJ adequately explained how he weighed that evidence.  Ultimately, the question before this Court is not whether there is evidence in the record to support Mr. Klein's preferred findings.  Even if a preponderance of the evidence supports a finding that Mr. Klein's subjective complaints are credible, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

For all of the reasons set forth above, the Court finds the ALJ appropriately addressed Mr. Klein's subjective complaints, in accordance with regulatory requirements articulated in SSR 16-3p, that the ALJ's findings were supported by substantial evidence, and that Mr. Klein has not met his burden to demonstrate otherwise.  Accordingly, the Court finds Mr. Klein's third assignment of error is without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 22, 2025

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge